May it please the Court, I represent Estell Davis, my name is Robert Spanner. I'd like to address a few of the matters that I think are clearly established that the appellee's position is incorrect. The first one I want to address is they've claimed under what I would consider some very competent hand-waving that there was no 1.2 percent rate, and therefore there was no conflict in the rates causing confusion among the rates between the 8.25 percent rates stated in the loan and the 1.2 percent rate stated in the loan, and I believe that the 1.2 percent rate is stated first. The language, the specific language is, sorry, the contention made by appellee is what is really meant is that the initial minimum monthly pay payment was set using a 1.2 rate. Isn't that what happened? That was it. Well, first of all, it wasn't exactly what happened, because what actually happened was it was set for a whole year, and the following year approximately the same rate. So the initial monthly payments were determined by using the 1.2 rate. That's correct. And if you read the note, it talks about on the 13th month they reset the payments. That's correct. That's correct. But what about the interest rate? I mean, is your argument that somebody thought this was the interest rate? What is your argument? The contention is that there was confusion created by multiple interest rates, which made the 1.2 percent rate. So it wasn't an interest rate. Well, that is a contention made by appellees, but the language used would indicate to a consumer that it was indeed an interest rate. But the rest of the document does make clear that that initial payment amount is not the interest rate stated in the note. It's a different amount. I mean, there may be other problems with this paragraph that says changes in my unpaid principal, but it does make clear that that's not the interest rate. The initial required monthly payment amount will not be sufficient to pay the interest,  The position of the appellee is that it was that the 1.2 percent was not charged. It was just used. They did say that in their brief, and I don't see how anyone can, you know, look at that argument and say that clearly there's a potential for consumer conclusion about whether the interest rate was 1.2 percent or 8.25 percent. And that's particularly the case when what she was, in fact, writing a check for and asked to write a check for was the one, the payment based on the 1.2 percent rate. Well, you know, look, you have to read the entire documents to understand it. And most people, I mean, how many people in this room when they buy a home and sign these documents sit down and read every item in the document? That's true, but the test is the reasonable consumer test. What one does, in retrospect, given the fact that many people don't, in fact, and could not, in fact, understand their note is you look to see whether the rates that are talked about obscure the relation of the terms to each other. And there is no, nothing anywhere in there that states that. Well, sure, there is directly. My interest required, my initial required monthly payment amount will not be sufficient to pay the interest that will accrue. Now, I want to talk, I'd like you to talk more about that provision for other reasons. But in terms of it saying that the initial required monthly payment amount is not the interest, it says that. But I don't think that the way that it says it, when you put 1.2 percent up at the top, you know, and you just know that that's what the sales are. Could you just go on to address the question of the negative atom merchantization? Because I must say that that's where I have the greatest problem. I'm sorry, I didn't hear you. It seems to me that the, that that paragraph is just, at least arguably, just incorrect because it says, it suggests that it is possible that the monthly payment amounts after the initial one, at least after the initial one, may be enough to pay the interest. And until they actually start paying the interest amount, it will never be enough to pay the interest. Isn't that right? In other words, my understanding of the way this thing is set up is that you pay 1.2 percent and the next year it can go up by something like 7.5 percent more. Right. And then the next year it goes up more until it hits 115 percent. So in those two, or a year and a half or so, it's going to be more, it's not going to be the initial amount, it's going to be a higher amount, but it's not going to be the interest rate either. And moreover, it couldn't possibly be the interest rate because the interest rate has a built-in 3.39 percent over the index and 3.39 percent is more than the percent they're paying. So it's never going to be that amount. So what I gather the counterargument is that this says may or may not and that's good enough. Do we have any case law on that question? I don't, Your Honor. You're not interested in this problem. You're interested in the 1.2 percent. I'm sorry? You're not interested in this problem. You're interested in the 1.2 percent argument. I'm not understanding your argument. Just to state it and then I'll move on. The loan disclosure says your initial monthly payment will be calculated using a rate that is lower than your initial interest rate. And so they refer to the 1.2 as the initial interest rate. And when you do that, it seems to me like. Where is that that you're reading from? Where am I reading? I only have it in my notes. But it's in the loan disclosure document, the third document, not the note in that. The loan program disclosure. Loan program disclosure. And I think also that, you know, the fact that there are various interest rates mentioned in different places throughout the various. So your whole focus here today is on the possible misinformation, misinforming the purchaser about these various interest rates? That's one of the points that I'm. What's the other one? Because of that, there was a failure to disclose the discount in the note because you have to say certain things that are indicated in our brief. Let's assume that there's not a problem with that. I'm sorry? Let's assume we disagree with your argument on that.  All right. Then where do you go to next? Okay. The issue of the negative amortization. Counsel does not present any set of numbers that could ever show that in any instance the negative amortization could be covered. Okay. Now, do you point to any provisions in any of these documents that support your argument? That support? Your argument that you just made. No. What I'm saying is it can't be that contention cannot be supported. Negative amortization is sure to occur. Well, the documents do say that it's sure to occur with regard to the initial payment. But the question is what does the document say after that? Well, there is an explanation by counsel claiming that because of the payment of the interest rate change and the payment amount changes that there is some possibility under some unidentified set of circumstances that there wouldn't be negative amortization. But he doesn't say what it is. And I certainly cannot figure out what it could possibly be. So I think that I'll reserve the remainder of my time. That's fine. Thank you. Good morning. Good morning, Your Honors. Jan Chilton for the defendant. Counsel, you can just have a seat here at the table. Right here. Yeah. Have a seat. Go ahead. Sorry. I will address the 1.2 percent rate very briefly. The Court seems not to be terribly concerned about it. I would point out that the promissory note states very clearly that it is not the interest rate, not only in the provision Judge Berzon mentioned, but in the very provision that mentions the 1.2 percent rate itself. It's paragraph 3B on page 88 of the excerpts of record. It says, My initial payment was calculated using the rate of 1.2 percent, the original principle and the month maturity date. This rate is lower than the initial interest rate. It could not be clearer that the 1.2 percent rate has nothing to do with interest rate. Furthermore ---- But I heard about the negative amortization. Yes. That part I don't understand how it is. Could you give me any scenario in which the payment rate after the initial payment rate, i.e., the payment rate for the next year at 8 months, wouldn't be negative amortization? Not necessarily the next year, although it could be. But certainly at the conclusion of the loan, it's definitely true. Yes. But what it says here is, let's see, my subsequent monthly payments could be lesser or greater than the amount sufficient to pay the interest. Right. But it first says, my initial required monthly payment net will not be sufficient. Right. And may be lesser or greater than the amount sufficient to pay the interest that will accrue under this note at the interest rates that are in effect under this note. And the ---- I mean, you're saying that we're supposed to read this as meaning that some monthly payment amount down the road, but not that's ---- Well, even, Your Honor, the initial monthly payment, the $1,200 that Ms. Davis ---- It would be sufficient to pay the interest. I'm sorry. Go ahead. Even that amount will exceed interest at the end of a loan because the loan principle is reduced. And even though the interest rate is higher, interest rate times reduced principle ---- You're not paying it at that point. You're paying it at the beginning. And therefore, there is negative amortization. No. At the time that you're paying it. No. No, no, no. Perhaps I'm not communicating well. If we agree that the initial monthly payment is $1,200, that amount, $1,200, will be greater than the amount of interest accruing monthly on this loan at the end of its term. Yes. But it's not being paid at the end of the term. It's being paid at the beginning of the term, as a result of which there is negative amortization. Absolutely. And that's clearly ---- What about the following year? The following year ---- It's not the initial payment anymore. It's the next payment. Right. And ---- There will definitely be negative amortization that year. Is that right? That's unless, unless there's a prepayment reducing the principal balance lower than the initial principal balance. It doesn't say anything about prepayments or anything. It doesn't. And it also doesn't say that each year the amount paid will or won't exceed, could be greater than or lesser than the interest rate. It says the initial payment may be greater than or less than the interest accruing ---- That's not true either. It will be less. It has to be less. No. Again, the interest rate is going to be always less on the initial payment calculation. But interest is multiplied by principal to come up with the actual amount of interest charged. And because interest rate times principal is involved, at the end of this loan, when loan principal has been reduced ---- Mr. Shelton, what you're saying makes no sense to me because it's not being paid at that. The question is negative amortization, i.e., are you going at some point to owe more than you did than the loan amount? That is a time-bound problem. And jumping 30 years ahead does not solve it. Well, Your Honor, if that's the problem you're having, let me just say that the disclosure that you're looking at is in the loan, which is not what TILA requires. TILA requires a disclosure in the TILA disclosure statement and in the loan program disclosure. The loan program disclosure could not be clearer that there will be, not just maybe, but will be negative amortization. If you look at page 99 of the excerpts of record, it says, As noted above, if you only make the required monthly payment, then beginning with your first monthly payment, there will be negative amortization on your loan. There will be additional negative amortization if the monthly payments that you subsequently make are less than the accrued interest. Yes, accrued interest on your loan. I'm sorry, I couldn't read it. But there's no if about it as to the first two and a half years. That's right. And there's nothing. Well, first of all, it absolutely says it as to the first. Right. But then what it doesn't say is that not only for the first monthly payment, but also for the next two and a half years. Well. Let me, before you answer that question. I don't know that it was a question. Could you explain to me in layman's terms how this loan worked? Yes. It's really rather simple. For the first two and a half years, the borrower pays at a set rate that's lower than the interest rate and so accrues additional loan funds. Basically, she's borrowing against the equity in her home. In those first two and a half years, is she given the option of paying the full interest? Oh, absolutely. Is she informed of that? Yes, I believe it. It says quite clearly that you can pay more. This is just the amount that is required to be paid. You know, the minimum monthly payment means what minimum means. This is the required minimum payment, and that's less than is really due under the loan. No. Well, really due under the loan. The minimum payment is what is due. In other words, the lender can't declare a default if you make your minimum payment. Just like if you pay the minimum payment due on your credit card, you are paying what's due. But for two and a half years, you're adding to the principal. Right. Just like with a credit card, if you make the minimum payment, you're charged interest on your balance. Is there any way you would know that by reading this document? Yes, I believe it quite clearly says that on pages 98 and 99 of the excerpts of record, which is the Your initial required monthly payment will not be sufficient to pay the interest rate. It doesn't say anything about the next year and a half. Well, it doesn't specifically say every if the minimum payment for the first two and a half years will be less than interest rate. But it does say that if the payment is less at any time during the life of the loan than the interest accruing, you will have negative amortization. And that's all that Tyler requires. So the other part of this loan, this particular optional arm, was that every year the 8.25 interest rate resets? Actually, I think it reset on a monthly basis. On a monthly basis, but the payment is not recalculated until one year later. The payment changes every year up until the ceiling of I believe it was 113 or 115 percent of original principal due is reached. At that point, it resets to the fully amortizing monthly payment. I see. And that would happen in the midst of a year, not at the end of a year. Okay. Let me just point out a couple of other things. Even if Judge Berzon, you were to hold that the loan program disclosure doesn't disclose negative amortization properly, the defendant would still win because it's an assignee of this loan, not the originator. Under Tyler, assignees are liable only for the district court never got to that, right? Well, it's true. And we can't get to it either at this point. I'm sorry? And we should get to it even though the district court didn't. Yes, because it's evident from the documents here, it involves no factual question. It's purely a question of law based on admitted documents, and those are three, the note, the Tyler disclosure statement, and the program disclosure. There's no doubt as to what those facts are. No one disputes them. Your legal contention then is that even if GMAC, was it GMAC? GMAC. Was the acquirer, was not only the servicer but the owner of the loan after a while, of the note, it's still not responsible. That's true because the negative amortization disclosure is not part of the, is not required to be by Tyler part of anything other than the loan program disclosure, which is not the disclosure statement, the Tyler disclosure statement, which is a separate document. It's at 95 of the excerpts of record. And it is not part of the assigned documents, which are the note and deed of trust. Is there any case law on that? It seems like a rather big question, i.e., given the fact that all notes seem to be sold these days, who's responsible for any initial disclosure? Yes. The, I believe we cited in our brief some cases on that. I don't have them in front of me right at the moment. But this has come up repeatedly. I mean, it's not a hidden provision. 1641A of Title 15 has been interpreted many times. And beyond that, we have the statute of limitations. This suit was filed three and a half years after consummation of the loan. Tyler ---- She was asking for equitable tolling of the statute of limitations. I'm sorry, Your Honor. Wasn't she asking for equitable tolling? She certainly was. That's nothing we could really decide. That would have to be decided. You can definitely determine as a matter of law whether simply having Alzheimer's disease is an adequate basis for equitable tolling. Equitable tolling ordinarily has required some reason in the documents themselves why you couldn't see that there was a Tyler violation, not any incapacity on the part of the plaintiff. That does not ---- incapacity of the plaintiff is not part of the doctrine of equitable tolling. So you can, as a matter of law, determine that the ---- I don't know about my colleagues, but I'm not sure I'm prepared to make that determination on this record at this time. Well, thank you, Your Honor, unless you have further questions. I don't have any further questions. One of the points that I did want to briefly discuss is, excuse me, the reliance by the district court upon documents that were authenticated by a person who had no personal knowledge, whatever of the documents or how they were prepared. And we asked that those be disregarded, and they were not disregarded. I think that that's an important question because there's a practice of doing that, and it's not a practice of the district court to do that. It's a practice of the district court to do that. And it's precisely that for convenience by banks to just send somebody out to look in the loan file and then he comes back and makes a declaration saying everything is fine and these documents are what they purport to be without any showing that he has any knowledge of that effect. On the point of equitable tolling, this Court has been very liberal in the application of King v. California. There's only one case that involves Alzheimer's and was very similar factually to this case, and it found, as a matter of evidence, and we think that evidence is very important is very similar to the evidence in the Meritage case as here, which would lead to the conclusion that equitable tolling is appropriate under the present circumstances. And, let's see, finally, I did want to point out that the arguments that they make the whole section of their brief in its entirety did not appear in the court below, so it's really not appropriate or fair for the courts to consider those arguments at this time. Thank you. Okay. Thank you. The matter will be submitted at this time. That ends our session for the day, and thank you all very much.
judges: Fernandez, Paez, Berzon